## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHANNON TAYLOR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRUSTED MEDIA BRANDS, INC.,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shannon Taylor ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

### INTRODUCTION

1.      Defendant Trusted Media Brands, Inc. ("Trusted Media")[1] sold personal information about Plaintiff Shannon Taylor's magazine subscription to list brokers, including for example NextMark, Inc., which in turn sold her information to telemarketers and other aggressive advertisers.  As a result, Ms. Taylor is being inundated with a barrage of unwanted junk mail and telephone solicitations.  By selling Ms. Taylor's Personal Reading Information (defined below), Trusted Media violated Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711, *et seq.* (the "PPPA").

---

[1] Trusted Media, is an international media company that publishes some of the most widely circulated magazines in the United States, including *Reader's Digest*, *Country*, *Simple & Delicious*, and *Taste of Home*.

2.     Documented evidence confirms these facts.  NextMark's website offers to provide telemarketers access to the Personal Reading Information of 5,322,910 subscribers from the "Trusted Media Brands, Inc.- Magazines MF & Enhanced Mailing List" at a base price of "$110/M [per thousand]," (i.e., 11 cents apiece).

# TRUSTED MEDIA BRANDS, INC. - MAGAZINES MF & ENHANCED Mailing List

Trusted Media Brand's (formerly Reader's Digest / Reiman Publications) is a leading publisher that offers mature consumers the opportunity to subscribe to one of their well known magazine titles. This masterfile was created using Birds & Blooms, Country, Country Woman, Family Handyman, Farm & Ranch Living, Reader's Digest, Reader's Digest Large Print, Reminisce, Simple & Delicious, and Taste of Home subscribers in order to give mailers the opportunity to best utilize the database. The file has been enhanced with data to offer a robust product for increased selectability and usage.

Get Count    Get Pricing    Get More Information

| SEGMENTS | | COUNTS THROUGH 12/29/2015 | MARKET: | CONSUMER | |
|---|---|---|---|---|---|
| 5,322,910 | TOTAL UNIVERSE / BASE RATE | $110.00/M | CHANNELS: | ✉ | |
| 5,322,910 | ACTIVE U.S. SUBSCRIBERS | $110.00/M | SOURCE: | DIRECT MAIL SOLD | |
| 683,206 | NOV'15 SUBSCRIBERS | + $17.00/M | PRIVACY: | UNKNOWN | |
| 1,615,730 | SEP'15-NOV'15 SUBS | + $14.00/M | DMA?: | YES - MEMBER | |
| 2,534,451 | JUN'15-NOV'15 SUBS | + $9.00/M | STATUS: | STANDARD PROVIDER | |
| 3,846,095 | DEC'14-NOV'15 SUBS | $110.00/M | GEO: | USA | |
| 539,492 | 12 MONTH PAID GIFT GIVERS | + $16.00/M | GENDER: | 72% FEMALE 20% MALE | |
| 111,806 | ACTIVE CANADIAN SUBS | $125.00/M | | | |
| | FUNDRAISER/NON-PROFIT | $75.00/M | SELECTS | | |
| | CATALOG RATE | $80.00/M | 1 MONTH HOTLINE | | $17.00/M |

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $17.00/M |
| 3 MONTH HOTLINE | $14.00/M |
| 3RD PARTY BLOW IN | $10.00/M |
| 6 MONTH HOTLINE | $9.00/M |
| AGE | $16.00/M |
| CHILD PRESENCE | $16.00/M |
| CHILDS AGE | $16.00/M |
| COA'S | $16.00/M |
| CONTRIBUTORS/DONORS | $16.00/M |
| ETHNIC/ETHNICITY | $16.00/M |
| GENDER/SEX | $9.00/M |
| GIFT GIVERS | $16.00/M |
| GRANDPARENT | $16.00/M |
| HOME OWNER | $7.00/M |
| INCOME SELECT | $16.00/M |
| LIFESTYLE | $16.00/M |
| NEW TO FILE | $12.00/M |
| NON RECIPROCAL | $10.00/M |
| PAID | $12.00/M |
| RELIGION | $16.00/M |
| RENEWALS | $12.00/M |
| SCF | $9.00/M |
| SOURCE | $12.00/M |
| STATE | $9.00/M |
| TITLE | $12.00/M |
| ZIP | $9.00/M |

**DESCRIPTION**

Trusted Media Brand's (formerly Reader's Digest / Reiman Publications) is a leading publisher that offers mature consumers the opportunity to subscribe to one of their well known magazine titles. This masterfile was created using Birds & Blooms, Country, Country Woman, Family Handyman, Farm & Ranch Living, Reader's Digest, Reader's Digest Large Print, Reminisce, Simple & Delicious, and Taste of Home subscribers in order to give mailers the opportunity to best utilize the database. The file has been enhanced with data to offer a robust product for increased selectability and usage.

Mailers have the opportunity to create "sub-group" masterfiles through specific publication selects.

*****************Fast Facts*******************
Average Age....................................63
Average HHI..........................$56,400
*********************************************

**ORDERING INSTRUCTIONS**

*See* Complaint Ex. B.

3.     NextMark also offers access to the Personal Reading Information of Trusted Media subscribers based on "age," whether the household has a "child present," that "child's

age," "ethnicity," "gender/sex," and "religion."

    4.     Trusted Media also offers access to its "Political Masterfile Mailing List" at the

same base rate of "$110/M."

# TRUSTED MEDIA BRANDS, INC. - POLITICAL MASTERFILE Mailing List

Trusted Media Brands, Inc. (formerly Reader's Digest) offers mature consumers the opportunity to subscribe to one of their well known magazine titles designed to provide wholesome entertainment. Their well-known brands include Birds & Blooms, Country, Country Woman, Family Handyman, Farm & Ranch Living, Reader's Digest, Reader's Digest Large Print, Reminisce, Simple & Delicious, and Taste of Home. Each brand successfully builds relationships with readers by offering respected content, either from TBMI or the readers themselves. With the use of their enhancement data, Trusted Media Brands, Inc. has been able to identify the political party affiliation of their subscribers and book buyers. These consumers also schedule time for various politically affiliated charitable / fundraising organizations in their busy lives.

Get Count    Get Pricing    Get More Information

| SEGMENTS | | COUNTS THROUGH 12/29/2015 |
| --- | --- | --- |
| 2,575,792 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 2,575,792 | ACTIVE U.S. SUBS/BUYERS | $110.00/M |
| 1,393,546 | DEMOCRATIC SUBS/BUYERS | + $16.00/M |
| 1,166,810 | REPUBLICAN SUBS/BUYERS | + $16.00/M |
| | FUNDRAISER/NON-PROFIT | $75.00/M |
| | CATALOG RATE | $80.00/M |
| | POLITICAL AFFILIATION | + $16.00/M |
| | (ALL ORDERS) | |

| | |
| --- | --- |
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 72% FEMALE 20% MALE |
| SPENDING: | $22.00 AVERAGE ORDER |

*See* Complaint Ex. C.  For an additional "$16/M" over the base "$110/M" rate (i.e., 12.6 cents

apiece), NextMark offers access to the Personal Reading Information of subscribers who are

"Democrats" or "Republicans."  *See id.*

    5.     Trusted Media also offers access to its "Charitable Donors Mailing List" at the

same base rate of "$110.00/M."

# TRUSTED MEDIA BRANDS, INC. - CHARITABLE DONORS Mailing List

Trusted Media Brands, Inc. (formerly Reader's Digest) is a leading publisher that provides consumers content to simplify and enrich their lives through any one of their brands of magazines or books. TMBI offers brands which focus on lifestyle categories including health, cooking, gardening, and travel. This Corporate Masterfile includes subscribers / buyers from Birds & Blooms, Country, Country Woman, Family Handyman, Farm & Ranch Living, Reader's Digest Magazine, Reader's Digest Large Print, Reminisce, Simple & Delicious, and Taste of Home.

Get Count    Get Pricing    Get More Information

| SEGMENTS | | COUNTS THROUGH 12/28/2015 |
|---|---|---|
| 4,283,593 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 4,283,593 | ACTIVE U.S. SUBS/BUYERS | $110.00/M |
| 502,889 | NOV'15 SUBS/BUYERS | + $17.00/M |
| 1,356,502 | SEP'15-NOV'15 SUBS/BUYERS | + $14.00/M |
| 2,053,121 | JUN'15-NOV'15 SUBS/BUYERS | + $9.00/M |
| 3,042,028 | DEC'14-NOV'15 SUBS/BUYERS | $110.00/M |
| | FUNDRAISER/NON-PROFIT | $75.00/M |
| | CATALOG RATE | $80.00/M |
| | DONORS (ALL ORDERS) | + $16.00/M |

| MARKET: | CONSUMER |
|---|---|
| CHANNELS: | |
| SOURCE: | DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 61% FEMALE 32% MALE |
| SPENDING: | $24.00 AVERAGE ORDER |

**DESCRIPTION**

Trusted Media Brands, Inc. (formerly Reader's Digest) is a leading publisher that provides consumers content to simplify and enrich their lives through any one of their brands of magazines or books. TMBI offers brands which focus on lifestyle categories including health, cooking, gardening, and travel. This Corporate Masterfile includes subscribers / buyers from Birds & Blooms, Country, Country Woman, Family Handyman, Farm & Ranch Living, Reader's Digest Magazine, Reader's Digest Large Print, Reminisce, Simple & Delicious, and Taste of Home.

Through their robust enhancement product, Trusted Media Brands, Inc. has been able to identify charitable donors to many types of organizations. By combining donor type with additional RFM or other enhancement criteria, mailers can better target their own potential donors for their own prospecting efforts.

*****************Fast Facts********************
Average Age.................................65
Average Income.........................$57,000
************************************************

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $17.00/M |
| 3 MONTH HOTLINE | $14.00/M |
| 3RD PARTY BLOW IN | $10.00/M |
| 6 MONTH HOTLINE | $9.00/M |
| AGE | $16.00/M |
| CHILDS AGE | $16.00/M |
| COA'S | $16.00/M |
| CONTRIBUTERS/DONORS | $16.00/M |
| ETHNIC/ETHNICITY | $16.00/M |
| GENDER/SEX | $9.00/M |
| GIFT GIVERS | $16.00/M |
| INCOME SELECT | $16.00/M |
| LIFESTYLE | $16.00/M |
| MULTI-BUYERS | $12.00/M |
| NEW STARTS | $12.00/M |
| NEW TO FILE | $12.00/M |
| NON RECIPROCAL | $10.00/M |
| PAID | $12.00/M |
| RELIGION | $16.00/M |
| RENEWALS | $12.00/M |
| SCF | $9.00/M |
| SOURCE | $12.00/M |
| STATE | $9.00/M |
| ZIP | $9.00/M |

*See* Complaint Ex. D. According to the list offering, "Trusted Media Brands, Inc. has been able to identify charitable donors to many types of organizations. By combining donor type with

additional RFM and other enhancement criteria, mailers can better target their own potential

donors for their own prospecting efforts."

6.      Michigan's PPPA clearly prohibits what Trusted Media has done.  Section 2 of

the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the
> business of selling at retail, renting, or lending books or other
> written materials ... *shall not disclose* to any person, other than the
> customer, a record or information concerning the purchase ... of
> those materials by a customer that indicates the identity of the
> customer.

M.C.L. § 445.1712 (emphasis added).

7.      Accordingly, Plaintiff brings this Class Action Complaint against Trusted Media

for its intentional and unlawful disclosure of its customers' Personal Reading Information in

violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

8.      To supplement its sales and advertising revenues, Trusted Media sells its

subscribers' personal information—including their full names, titles of magazines subscribed to,

and home addresses (collectively "Personal Reading Information"), as well as myriad other

personal, lifestyle, and demographic information such as gender, age, ethnicity, income, religion,

parental status, and political affiliation—to data miners and other third parties without the written

consent of its customers.

9.      Trusted Media's disclosure of Personal Reading Information, and other personal,

demographic, and lifestyle information is not only unlawful, but also dangerous because it allows

for the targeting of particularly vulnerable members of society.  In fact, anyone can buy a

customer list from Trusted Media that contains a number of categories of detailed subscriber

information.  For example, a purchase could buy a list with the names and addresses of all

*Reader's Digest* subscribers who are Jewish, Republican, single, over the age of 80, with a net worth of greater than $500,000, no children in the household, and a history of charitable donations. Trusted Media would sell such a list for approximately $180 per thousand subscribers listed.

10.     While Trusted Media profits handsomely from the unauthorized sale and disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its subscribers' privacy and statutory rights because Trusted Media does not obtain its customers' written consent prior to selling their Personal Reading Information.

## PARTIES

11.     Plaintiff Shannon Taylor is a natural person and citizen of the State of Michigan. Plaintiff Taylor is a subscriber to *Reader's Digest* magazine, which is published by Trusted Media. Prior to and at the time she subscribed to *Reader's Digest*, Trusted Media did not notify Plaintiff Taylor that it discloses the Personal Reading Information of its customers, and Plaintiff Taylor has never authorized Trusted Media to do so. Furthermore, Plaintiff Taylor was never provided any written notice that Trusted Media sells its customers' Personal Reading Information, or any means of opting out. Since subscribing to *Reader's Digest*, and continuing to present, Trusted Media has disclosed, and continues to disclose, without consent or prior notice, Plaintiff Taylor's Personal Reading Information to data mining companies including Insource and others, who then supplement that information with data from their own files. Moreover, during that same period, Trusted Media has sold – and continues to sell and offer for sale – mailing lists containing Plaintiff Taylor's Personal Reading Information to third parties seeking to contact Trusted Media subscribers, without first obtaining Plaintiff Taylor's written consent or even giving her prior notice of the disclosure and sales. Because Trusted Media sold and disclosed her Personal Reading Information, Plaintiff Taylor now receives junk mail and

telephone solicitations offering discounted magazine subscriptions, among other things. These unwarranted offers waste Plaintiff Taylor's time, money, and resources. These harassing junk mail offerings and phone call solicitations received by Plaintiff Taylor are attributable to Trusted Media's unauthorized sale and disclosure of her Personal Reading Information. Because Plaintiff Taylor is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Trusted Media's sale of her Personal Reading Information deprived Plaintiff Taylor of the full set of benefits to which she was entitled as a part of her *Reader's Digest* subscription, thereby causing economic harm. Accordingly, what Plaintiff Taylor received (a subscription without statutory privacy protections) was less valuable than what she paid for (a subscription with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *Reader's Digest* subscription had she known that Trusted Media would disclose her Personal Reading Information.

12.    Defendant Trusted Media Brands, Inc., formerly known as Reader's Digest Association, Inc., is a Delaware corporation with its principal place of business at 750 Third Avenue, New York, New York 10017. Trusted Media does business throughout Michigan, New York, and the entire United States.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over Trusted Media because Trusted Media

conducts substantial business within New York, such that Trusted Media has significant, continuous, and pervasive contacts with the State of New York. Additionally, Trusted Media's principal place of business is in New York, New York.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Trusted Media does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Trusted Media's principal place of business is in this District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

18.     Section 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

8

M.C.L. § 445.1712 (emphasis added).

19.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

20.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act,  18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

21.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

22.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers,  clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*,  House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto  as **Exhibit A**).

23.     Despite the fact that thousands of Michigan residents subscribe to Trusted Media publications, Trusted Media disregards its legal responsibility by systematically  violating the

PPPA.

***The Personal Information Market:  Consumers' Personal Information Has Real Value***

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

25.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount
> of information collected by businesses, or why their information
> may be commercially valuable. Data is currency. The larger the
> data set, the greater potential for analysis—and profit.[4]

27.     In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers.  Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf  (last visited July 15, 2015).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 15, 2015).

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited July 15, 2015) (emphasis added).

unregulated market.[5]

28.    The scope of data miners' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

29.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

30.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

31.    In their letter, the co-Chairmen recognized that:

By combining data from numerous offline and online sources, data

---

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 15, 2013).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 12, 2015).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 15, 2015).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 15, 2015).

> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of
> serious privacy concerns.[9]

32.     Data mining is especially troublesome when consumer information is sold to

direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers

often use consumer information to lure unsuspecting consumers into various scams,[10] including

fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Trusted Media

share information with data miners and direct-mail advertisers, they contribute to the "[v]ast

databases of names and personal information" that are often "sold to thieves by large publicly

traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers"

and other criminals.[11]

33.     Information disclosures like Trusted Media's are particularly dangerous to the

elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are

often at home, rely on delivery services, and are lonely for the companionship that telephone

callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of

fraudulent telemarketers who take advantage of the fact that many older people have cash

---

[9] *Id.*

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 15, 2015).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited July15, 2015).

[12] *Id.*

reserves or other assets to spend on seemingly attractive offers."[13]

34.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Trusted Media's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

35.     Trusted Media is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

37.     As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled

---

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 15, 2015).

[14] *See id.*

[15] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe,  http://www.truste.com/us-consumer-confidence-index-2013/ (last visited July 15, 2015).

said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

39.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

40.    In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

41.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

42.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, where a

---

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 15, 2015).

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 15, 2015).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 15, 2015) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Trusted Media Unlawfully Sells its Subscribers' Personal Reading Information*

43.     Trusted Media maintains a vast digital database comprised of its subscribers' Personal Reading Information.  Trusted Media discloses its subscribers' Personal Reading Information to data mining companies including Insource and others, who then supplement that information with additional sensitive personal information about each Trusted Media subscriber, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-D**).

44.     Trusted Media then sells its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

45.     As a result of Trusted Media's data compiling and sharing practices, companies can purchase mailing lists from Trusted Media that identify Trusted Media subscribers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  Trusted Media's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Trusted Media will sell—to anyone willing to pay for it—a list with the names and addresses of all *Reader's Digest* subscribers who are Jewish, Republican, single, over the age of 80, with a net worth of greater than $500,000, no children in the household, and a history of

charitable donations.

46.      Trusted Media does not seek its subscribers' prior written consent to any of these disclosures and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

47.      Consumers can sign up for Trusted Media subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Trusted Media never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Trusted Media uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before disclosing their Personal Reading Information.

48.      As a result, Trusted Media disclosed and continues to disclose its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for it.

49.      By and through these actions, Trusted Media has intentionally disclosed to third parties its Michigan subscribers' Personal Reading Information without consent, in direct violation of the PPPA with Plaintiff and other members of the Class.

## CLASS ACTION ALLEGATIONS

50.      Plaintiff seeks to represent a class defined as all Michigan residents who had their Personal Reading Information disclosed to third parties by Trusted Media without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest,

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 15, 2015).

and officers or directors of Defendant.

51.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

52.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Trusted Media is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines); (b) whether Trusted Media obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Trusted Media's disclosure of Plaintiff's and the Class's Personal Reading Information violated the Preservation of Personal Privacy Act, M.C.L. § 445.1712; and (d) whether Trusted Media's sale of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

53.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

54.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by

Plaintiff and her counsel.

55.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

### COUNT I
**Violation of the Preservation of Personal Privacy Act**
**(M.C.L. § 445.1712)**

56.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

57.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Trusted Media.

58.     As a magazine publisher that sells subscriptions to consumers, Trusted Media is engaged in the business of selling written materials at retail.  *See* M.C.L. § 445.1712.

59.     By subscribing to *Reader's Digest*, Plaintiff purchased written materials directly from Trusted Media.  *See* M.C.L. § 445.1712.

60.     Because Plaintiff purchased written materials directly from Trusted Media, she is

a "customer" within the meaning of the PPPA. *See* M.C.L. § 445.1711(a).

61.    At all times relevant, and beginning on the dates Plaintiff initiated her *Reader's Digest* subscription, Trusted Media disclosed Plaintiff's Personal Reading Information, which identified her as a *Reader's Digest* subscriber, in at least two ways.

62.    First, Trusted Media disclosed mailing lists containing Plaintiff's Personal Reading Information to data mining companies including Insource, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Trusted Media.

63.    Second, Trusted Media sold its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

64.    Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Trusted Media was able to increase its profits gained from the mailing list sales.

65.    By selling or otherwise disclosing its subscriber lists, Trusted Media disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from Trusted Media. *See* M.C.L. § 445.1712.

66.    The information Trusted Media disclosed indicates Plaintiff's name and address, as well as the fact that she subscribed to *Reader's Digest*.  Accordingly, the records or information disclosed by Trusted Media indicate Plaintiff's identity. *See* M.C.L.§ 445.1712.

67.    Plaintiff and the members of the Class never consented to Trusted Media disclosing their Personal Reading Information to anyone.

68.     Worse yet, Plaintiff and the members of the Class did not receive notice before Trusted Media disclosed their Personal Reading Information to third parties.

69.     On information and belief, Trusted Media's disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

70.     Trusted Media's disclosures of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

71.     Trusted Media's disclosures of Plaintiff's Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Trusted Media's revenue.  Accordingly, Trusted Media's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

72.     By disclosing Plaintiff's Personal Reading Information, Trusted Media violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* M.C.L. § 445.1712.

73.     Additionally, because Plaintiff and the members of the Class paid for their Trusted Media subscriptions, and Trusted Media was obligated to comply with the PPPA, Trusted Media's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Trusted Media's unlawful sale and disclosure of their Personal Reading Information caused her to receive less value than she paid for, thereby causing her economic harm.

20

74.    Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

75.    Accordingly, had Plaintiff been adequately informed of Trusted Media's disclosure practices, she would not have been willing to purchase her *Reader's Digest* subscription at the price charged, if at all.  Thus, Trusted Media's unlawful disclosures caused Plaintiff economic harm.

76.    Trusted Media's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements and marketing calls to her cellular phone.

77.    As a result of Trusted Media's unlawful and continued disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of herself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant Trusted Media to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the PPPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## COUNT II
### Unjust Enrichment

78.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

79.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

80.     Plaintiff and the Class members conferred benefits on Trusted Media by providing Trusted Media with their Personal Reading Information and paying Trusted Media for their magazine subscriptions.  Trusted Media received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to Trusted Media publications.

81.     Because Trusted Media received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because Trusted Media has employees handling customer accounts and billing as well as customer data, Trusted Media appreciates or has knowledge of such benefits.

82.     Under the PPPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

83.     Under principles of equity and good conscience, because Trusted Media failed to comply with the PPPA, Trusted Media should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by selling Plaintiff's and the Class's Personal Reading Information.

84.     Plaintiff and the other Class members have suffered actual damages as a result of Trusted Media's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

85.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Trusted Media's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

86.     Further, a portion of the purchase price of each Trusted Media magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

87.     To prevent inequity, Trusted Media should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Trusted Media's sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

88.     Accordingly, Plaintiff and the Class members seek an order declaring that Trusted Media's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of  money obtained by Trusted Media through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

## **PRAYER FOR RELIEF**

89.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.     For an order declaring that Defendant's conduct as described herein violates the Preservation of Personal Privacy Act, M.C.L. § 445.1712;

C.     For an order finding in favor of Plaintiff and the Class on all counts

asserted herein;

D.      For an award of actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, M.C.L. § 445.1715(a);

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and;

H.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  March 7, 2016                           Respectfully submitted,

                                                **BURSOR & FISHER, P.A.**


                                                By:   */s/ Joseph I. Marchese*
                                                          Joseph I. Marchese

                                                Scott A. Bursor
                                                Joseph I. Marchese
                                                Philip L. Fraietta
                                                888 Seventh Avenue
                                                New York, NY  10019
                                                Telephone: (646) 837-7150
                                                Facsimile:  (212) 989-9163
                                                Email:  scott@bursor.com
                                                          jmarchese@bursor.com
                                                          pfraietta@bursor.com

                                                *Attorneys for Plaintiff*